Good morning. Judge Abudu and I are pleased to welcome our colleague from the Middle District of Florida, Judge Thomas Farber, to assist us with our work. We have a long-standing custom of inviting district judges from within our circuit after they've been on the bench for a couple of years to sit with us for a couple of days. We appreciate it. They're doing that work over and above the work that they have on the district court. It enables them to see how we do our work, and it allows us to get to know them and to hear a bit about how our precedents work or maybe don't work on the ground. As our filings have fallen over the last several years, as they have in all the circuit courts, we've stopped inviting judges from other circuits to sit with us, but we still have tried to maintain a calendar that allows district judges to sit with us for at least a few days. We're grateful that it's his turn today to assist us with our work. We have three appeals to hear this morning. Counsel, we're familiar with your cases. You don't need to come up and start trying to tell us the facts. We know what the case is about. We've read your briefs, the authorities cited in your briefs, jurisdictional briefs, if that pertains. We've looked at at least portions of the record. So you have limited time this morning. Please feel free to get straight to the heart of your argument. We're probably going to have some questions. Pay attention to the traffic lights. When the question from us, you can, of course, finish your answer. Be mindful, please, of our time. Our first appeal this morning is Lowry v. AmGuard Insurance. Mr. Washburn. Good morning, Your Honor. Good morning. May it please the Court, my name is Lee Washburn. I'm here representing the appellant AmGuard Insurance Company and my colleague, Kyle Barrett. The district court in this case erred by making improper factual findings at the summary judgment stage, weighing evidence as opposed to applying the appropriate standard of review in determining whether or not there was a genuine dispute of material fact, and in so doing, misapplied both contractual interpretation and Georgia law on the doctrine of reformation through mutual mistake. Correspondingly, the plaintiff's summary judgment on the breach of contract claim necessarily flows from reforming the contract in the first place, the contract in this case. Now, we had asked for jurisdictional briefing in this case. You take the position that we have jurisdiction, that we have a final judgment, right? I believe so, yes, Your Honor. We had submitted a joint statement with the attorneys on the issue and cited to the court. There's a little bit of confusion about why we have jurisdiction, but it seemed to me that there's a precedent from 1981 from the old Fifth that binds us called Mid-City Management Court, where at trial, there was a counterclaim still pending, and the counterclaimant abandoned that claim in response to questioning by the district judge, and our predecessor court treated that as an effective abandonment of a claim and held as a jurisdictional matter that as a result of that, all claims had been resolved and there was a final judgment. Would you take the position that that controls us? I believe so, Your Honor. As you said, you're familiar with the case. The procedural posture is that the court entered a order granting partial summary judgment. We then in turn sought to certify that as a final order for purpose of no interruption. Right, and you filed non-opposition to that? Correct. We were familiar with the case. You were fine with their abandonment of that claim and agreed with them that as a result of that, there were no claims remaining? Yes, Your Honor. That was the only remaining count that issued. The court did not grant summary judgment in our favor on the bad faith claim, which was count three. The district court understood that then to mean that there were no claims left to be resolved and entered a final judgment. I believe you construed that abandonment as a Rule 15 and or Rule 41 motion, abandoning that motion. Let me tell you something. Don't even talk to me about Rule 41. Yes, Your Honor. Rule 41 refers to the dismissal of an action. Lawyers and district courts are using it all the time to dismiss claims or parties. Just read the rule. It doesn't refer to that. It creates all kinds of jurisdictional problems for us. I agree with you there. I think under the way they filed their notice of abandonment, the court is entitled to construe that as a Rule 15 intent to essentially amend the party's pleading to fashion a final judgment. The claims at issue were resolved at summary judgment. I have heard from you about that. If there is anything to be said about your adversary on it, we can get to it. Why doesn't Occidental control the outcome of this case? It seems to be that that Georgia decision seems to be as squarely on point as just about any case I can imagine for this case. I anticipated that might be the very first question I received, Your Honor. I spent a lot of time with my colleague yesterday going over it and going through our briefs. And I think there is a manner in which it can be distinguished. I agree that ostensibly it appears very applicable. However, the reason I believe it does not apply to this particular case is that in Occidental, there is only one potential alternative insured that could be named. So the original named insured in that case is the Irish Bread Bar and Grill Roman numeral 5 LLC. And the intended insured was the R&R Spirits of Atlanta, the party that purchased the bar and began operating it and who did submit the insurance application. However, there is no obvious who it could have been. If you look at the insurance declaration, which was filed as part of the plaintiff's motion for summary judgment, she expressly acknowledges that she was seeking insurance for multiple restaurants, which were all operated by multiple different entities. And therefore, if you follow that line of reasoning under the way that the district court and the appellees have reasoned in this case, not only would it have changed the named insured in place of the ostensibly insured shall and shall, but all of those entities would then become named insureds under that policy. The problem, it seems to me, is that what is ostensibly the named insured is an entity that does not exist. And shall and shall does exist, clearly owns this restaurant and is a party for whom your company has provided a defense under the policy in previous lawsuits, obtained releases on their behalf in previous lawsuits, substituted their name as defendants in previous lawsuits. None of that helps you, it seems to me. I don't disagree with you there. I believe that the reason that we can, again, those post-formation, post-execution of the instrument acts or events should not be used to enforce the intent at the time of issuing the original policy. We cited a case in our briefing that a renewal, and these are true, pure renewals, they are marked renewals, is not an entirely new instrument or contract. And as a result, the time at which you need to evaluate the party's intent here is at the time of execution or issuance of that original policy in 2013. In 2013, there's no record evidence... But the Georgia courts have said you can consider subsequent conduct as evidence of true intent. In FOX, it's hard for me to forget that case. First Chatham Bank in 2014. That case is a bit different and it involves parallel evidence in terms of the parties had acted via oral agreement was the issue here, issuance of an oral agreement. Take FOX then, which you don't like. It says actual conduct of both parties after contract formation, right, can inform whether there's been a mutual mistake, right? It can. And even if you apply that case here, we don't believe that the occurrences rise to the level because it's not just a preponderance of the evidence standard. The standard to apply a mutual mistake and reform a contract under that doctrine is clear, decisive, and unequivocal. We've got here, there is deposition testimony from example, Christopher Gates, that those prior cases, the Addis and the Love lawsuits that you've referenced that the AmGuard had settled and for which it obtained releases for various defendants or insurers including Xiao and Xiao, in those instances, those claims were resolved cheaply, $12,500, $30,000 on the other one, and therefore they did not warrant the kind of intensive coverage scrutiny because it's a business decision to resolve those claims. But still, regardless of the amount at issue, your company still decided to cover those cases. And so if nothing else, I think your brief also speaks to a mutual departure. And so would AmGuard's decision at that point to cover Xue and Xue's loss not suggest that you all were maybe on the back end recognizing the mistake or reforming the contract or agreeing that you all would ignore or otherwise accept the fact that the party listed as the insured was different than who you all on two separate occasions decided to insure? Your Honor, I would disagree in the sense that I would not agree that they agreed to insure. Now, they did defend and resolve those claims. There's no evidence in the record that they performed a kind of coverage analysis and said, oh, that is our insured. What they did was they followed a defense counsel recommendation, a strategic advice to resolve those claims and have Xiao and Xiao as part of those lawsuits. But I think it's also important to remember that at the time those prior lawsuits or claims were initiated, the new claims were like entities which are other Xiao related entities were part of those original complaints and hence potentially the trigger. Your counsel, your appointed counsel and the add-a-suit told your client, quote, your insured is Xiao and Xiao Inc. This company owns and operates Noodle College Park, right? Yes. And the defense counsel is not supposed to be involved in coverage determinations. I don't know that his coverage analysis can be applicable there, but he states that that's true. That's that's part of the report. I think the way that we need to evaluate the fact that the standard is clear, decisive and unequivocal is that what happened in this case at the district court level, I'm running out of time, hence I'm trying to summarize my point tightly, is that the district court took pieces of evidence and stacked them together. It is essentially tantamount to what would be a bench trial verdict or a jury verdict as opposed to there's a clear, decisive and unequivocal result based upon that information. I don't think it quite reaches that standard. Well, if this case had been about $12,000 or $30-something thousand dollars, you wouldn't be here today, but because a million dollars is at stake, now you are arguing that somehow Xiao and Xiao was not the proper insured and you shouldn't cover anything. I'm not sure about that, Your Honor. I don't think that that was ever delved into in the way that it was. Certainly what it looks like. Your argument is a little technical. This is equity. Are you saying there are no equitable theories of recovery under these facts that would work for them? Or are you saying that the one they've chosen, they haven't crossed all the T's and dotted the I's on? The latter, Your Honor. I think it's raised in the district court opinion and issues that they did not pursue a, I think you raised a mutual departure argument. They didn't pursue those kind of post-contractual theories. So if it's equity, I mean, isn't that something that we should kind of be okay with? I think the requirement to frame the pleadings properly and the count you're proceeding under is important because it frames the course and scope of the discovery process in terms of what needs to be briefed. And therefore, if you were allowed to, after the close of discovery and at the briefing stage, sort of shift gears and claim, well, I was seeking a specific count for mutual mistake, but in fact, I'm arguing an entirely different new cause of action or claim or theory, that is a bit unfair to the adverse party. And they need to be evidence and the claims need to be under the specific cause of action or theory they proceeded under. Okay. Thank you, Your Honor. Thank you. Thank you. Mr. Binkle, is that how you? Yeah, please speak with us. May it please the Court, it's my honor to represent Gina Lowry and her husband, John, in this action. The district court correctly found clear, unequivocal and decisive evidence of mutual mistake. You agree with me about the jurisdictional analysis that I went through with your opposing counsel? Yes, Your Honor. I agree with your jurisdictional analysis. And in our joint statement to the court, we requested that the court view our abandonment as a motion to amend the amended complaint. Well, we don't even really, it seems to me, have to get into all of that if the Mid-City decision binds us that an abandonment of the type that occurred here resolves a particular claim. I agree with that, Your Honor. Okay. So, in this case, the district court was correct and had a very reasoned and structured opinion in this case, finding clear, decisive and unequivocal evidence of mutual mistake. And the mutual mistake was both parties were under the misconception that this policy insured the owner and operator of the restaurant at Noodle College Park. And as the court is very aware in the record, it's made out to Noodle Inc., which is not a corporation under Georgia law or, I mean, it's not registered with the state, Secretary of State. And Ms. Lena Shao made a clear affidavit that they have no relationship or any ownership. Counselor, just to be clear about the record, that mistake that you just described existed with respect to a worker's compensation policy, too, correct? That's correct, Your Honor. And it was corrected at that point, but why wasn't it corrected for, I think, the business owner policy? There's evidence in the record from the insurance agent that they requested that the business owner policy be also corrected. They being Shao and Shao? The agent requested it. Oh, the agent requested it, okay. And that is a disputed issue, but not material to the issue of summary judgment in this case. But that is a very fair question. Why wasn't both of the policies reformed when they made the decision to reform the worker's compensation policy when it came to light that instead of a single owner with three restaurant locations, they had three corporate entities insuring the exact same three restaurant locations? And the worker's comp policy named the same non-existent entity, Noodle Inc.? It did, Noodle Inc. And in the record, it's not clear, but in the record, you can see that AmGuard, while these are two different lines of insurance, AmGuard assigns a customer or account name or number inside of the same account name or number. I take it your position is that Occidental does control us here? Yes, Your Honor. Occidental is on all fours in this case. In that case, the application was mistakenly filled out for the former owner by the new owner. Occidental, I mean, the new owner, all they did was they received an application for Irish Bread Pub and Grill, Inc., and Irish Bread Pub and Grill, and they issued the policy. Unknown to them, R&R Spirits actually was the real owner and the only party with an insurable interest. And the Court of Appeals asked the question, or made the statement, I'm sorry, you know, Occidental has not explained why they would issue a policy in the name of an entity that has no insurable interest in the restaurant. Well, if I understand AmGuard's brief correctly, they seem to allege some kind of unjust enrichment on Shao and Shao's part. Other than paying the premiums, is there any extra advantage that Shao and Shao benefited from in not being specifically listed in the insurance agreement, but nevertheless benefited from it? No advantage whatsoever, Your Honor. There's no evidence in the record explaining how AmGuard's allegation that the premium would be different for three entities versus one entity. They have three identical, the exact same three locations. They don't explain how the risk would be any different or how the premium would be any different if they had listed all three corporate entities with those same three locations. Well, I mean, well, we have an affidavit from an individual who maybe wasn't involved at the time, but when the litigation came up, says, well, we would have charged more money had we known. What do you make of that? That's Monday morning quarterback, in my view, Your Honor. The self-serving affidavit of Mr. Al Marcinkiewicz, if you read it carefully, it simply states that if we had, if it had been local business entities as opposed to one, we would have charged a different premium. The district court dealt squarely with that and said a mere scintilla of evidence does not give them past summary judgment. In the affidavit, the declaration from Mr. Marcinkiewicz, you will notice that he doesn't address the three locations in any way. So we contend, Your Honor, that that declaration is merely a conclusory statement without any entry support. So the trial judge is allowed to look at this and say, well, it's nice and short, that's good, but it's too short, doesn't have enough detail, it's conclusory, it's scintilla of evidence, it doesn't count as creating any issues at all and move forward. Yes, Your Honor. Yes, it does. And in any event, so the two previous lawsuits where defense was tendered were also the same restaurant location? Yes. College Park, Noodle College Park, and both? Both of those cases. And so maybe, so even if we engaged in the speculation that there might have been a different premium had there been an awareness of all three entities, at the very least, the very entity that's involved in this case for which a defense was tendered in the earlier lawsuits, all the same, all the same location? Yes, Your Honor. Yes, Your Honor. And I want to make two points in this regard. First of all, we're merely requesting that the court reform the contract. Well, the district court has. What you're asking is that we affirm it. Yes, Your Honor. We're merely asking you to affirm the district court's decision to replace Noodle, Inc., a fictitious entity, with Xiao Xiao, regardless of the number of alleged insureds they may want to claim at this point. Another important matter regarding the premium is there is evidence in the record that each time Xiao Xiao took a location off, the premiums increased. And in 2018, the insurance agent wrote an email to the underwriter saying, we have just one location now, and our premium is greater than it was when we had three locations.  And the one location that was left, Noodle College Park. Yes. When the name was corrected for the workers' policy, did the premium change? There's no evidence in the record that the premium changed whatsoever. In fact, the payroll that was submitted at the end to audit for purposes of workers' compensation were three payrolls for the three restaurants. And if the court looks closely, you will see that those three payrolls match up with the amount of payroll listed on the questionnaire submitted by the insurance agent in 2013. What about, so there's a million dollar settlement that, and this is a play on words we haven't heard yet, that somebody stands in the shoes of the shoes. What happens with that? I mean, normally these insurance companies do a reservation of rights and stay in the case so something like this doesn't happen. Did you do the case at the trial court level? Do you know? No, we've had the case from day one. And the insurance company was so confident in this position that they didn't even do a reservation of rights? They just... They have never done a reservation of rights as to shall and shall in any claim that was brought as to Newhill College Park. Because it's a little unsettling to say, well, now they might, well, they are, right, unless they win this appeal. They're on the hook for a million dollar consent judgment and something they didn't participate in but... Well, under the Dow's case in Georgia, an insurance company, when faced with a question of coverage, has a decision to make. They can either accept coverage, defend and indemnify, they can defend and indemnify under a reservation of rights and pursue a deck action, or they can deny coverage. And if they deny coverage, then they are on the hook for any negotiated settlement that is within the policy limits. They can't attack it. And potentially for a bad faith claim, would you abandon it? And I did abandon the bad faith claim, Your Honor, and, you know, I can explain why we did that. Oh, no, it doesn't matter. Not to me. But, I mean, that would be something also at play ordinarily. It would, Your Honor. Any questions? I want to briefly address the prejudice issue. They claim they would be prejudiced by having to pay the judgment. Your Honor, again, Occidental Controls in this matter, an insurance company or any party cannot be prejudiced by being made to pay what it paid for or what it owes. In this case, the shoes, the shalls, they paid premiums on these policies over a six-year period. They cooperated fully, and it would be an injustice, and it screams for equity in this case, in order to have them indemnified. Thank you. I think we have your case, Mr. Diekel. We'll hear from Mr. Washburn for five minutes. Thank you. Thank you, Your Honor. To briefly address the points, Mr. Diekel raised that the parties were operating under this mutual mistake, mutual misconception, I think is the term used in the case law. We disagree there. Now, we agree there is obviously a misunderstanding. There's a disconnect here, but they're not operating under the exact same misconception which is required, or even one that is, I think, under CUMEO, you know, substantially identical. Here we've got the shall, by virtue of the Lena shall declaration, saying we're seeking coverage for three different entities, and we've got AMGARD saying we're insuring a single entity. We don't understand. We don't know who, AMGARD doesn't, at the time, doesn't know who this is. It's really one entity. I mean, the named insured is Noodle Inc., which doesn't exist. And the equitable reformation would make it shall and shall, one entity. I don't agree there, since because they've got multiple different restaurants that are all operated by multiple entities, all of them become named insureds, and I think that's the difference. Shall and shall is the only entity they ask to have as the name insured, right? It's the only one they're asking for, but if you follow their line of reasoning, any entity... All the district court did as a matter of equitable reformation, right? Yes. One entity for one entity. The problem with that is that if you follow the line of reasoning, that any entity that the shall has intended to be insured could then become one. So it wouldn't just... But that's not, I mean, what we're here to evaluate is whether the district court heard or not. And the only thing the district court did was equitably reform the policy to substitute one entity for one entity. Isn't that right? That's the only thing it did, but the reason I believe that it erred... The reason it erred is what? Because it could have affected something else that's not before us and we don't have a judgment about? Because any entity can then turn around and claim that it's actually the name insured, and that's, the reason is you can't use that to evaluate what the intent was at the time of issuance of that original policy, because it becomes convenient to say, well, now we want shall and shall, but it could have just as easily been new to life or both that or three L shall. Any of those other entities that had previously been sued as part of the shall family web of entities in these Addison Love lawsuits. There were multiple other defendants in those cases as well. Any of those could turn around and say, well, now I'm actually entitled to be the name insured under that policy. And that's the disconnect that I think you, where we get to, there isn't a common shared misconception at the time of issuance of the policy. Well, it seems to me at the very least that AmGuard understood that it was going to be providing coverage for Noodle College Park, and the owner of Noodle College Park is shall and shall. What am I missing? That is part of the story. There is a greater amount of facts, hence the other part of our argument is that the court, I think as Judge Barber pointed out, sort of cherry-picked the evidence of, well, this points to this and this points to this, as opposed to weighing whether or not it was a genuine dispute of material fact. Judge Thrashton said, well, taking that all together, the only plausible explanation is this. And he reached a conclusory decision weighing evidence and saying, this makes more sense than that. I find this to be more persuasive than that piece of evidence. For example, the Marking Cabbage Declaration, he just dispenses with it. He says, I find it to be a scintilla, I don't find it to be persuasive, as opposed to, well, it does create a genuine dispute of fact as to what their intent was and how they would have acted had they known about multiple entities. So what happens if you win the appeal, then you go back and it's equity, I assume that it would be a bench trial and we know what the judge thinks. I think there is a potential for a jury trial here, but yes, I think if we go back before the judge, we are likely to result in a bench trial weighing evidence. But then the parties are actually present for testimony, there's a different possibility of the outcome given that, you know, as opposed to reading the papers, the judge is going to have to hear from witnesses. And if I could raise one brief point, I know it's very obvious, but I'd like to make it that to the extent we prevail on the equitable reformation claim on the appeal, either in terms of reversing the grand summary judgment or reversing the trial court decision entirely, the breach of contract claim necessarily flows from it and would have to reach the... And to the extent that we affirm the equitable reformation, we're going to have to affirm the breach of contract. Absolutely. The same. Okay. Thank you. Thank you. Who wants to tell me how to pronounce this one?